IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Donald C. Berlin, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is submitted in support of an application to search the following cellular telephones,
   which I obtained from the Richland County Sheriff's Department (RCSD) evidence room on May
   14, 2019 and are currently in custody at the ATF Columbia Field Office, using a range of data
   analysis techniques.  Each of the phones are more particularly described in Attachment A hereto,
   which is incorporated by this reference:

   - A silver and black Apple iPhone Model A1688 cellular telephone, hereinafter referred to
     as Target Telephone 1 (TT-1), along with its contained SIM card and any removable media.

   - A Samsung Model SM-G890A cellular telephone bearing IMEI: 352131071028367,
     hereinafter referred to as TT-2, along with its contained SIM card and any removable
     media.

   - A Samsung Model SM-N920V cellular telephone bearing IMEI: 990005890512016,
     hereinafter referred to as TT-3, along with its contained SIM card and any removable
     media.

2. I am a Special Agent ("S/A") with ATF, United States Department of Justice.  I have been
   employed by the ATF since January 31, 2010.  I am a graduate of the Criminal Investigator
   Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as
   the ATF Special Agent Basic Training Academy. I am assigned to the ATF Columbia Field Office

and have been since September of 2016. My duties include investigating violations of federal firearms laws, violent crime, and gang activity in the city of Columbia, SC. I was previously assigned to the ATF Tucson II Field Office in Tucson, Arizona. I have participated in investigations of state and federal firearms violations, illegal firearms trafficking, narcotics trafficking, armed drug traffickers, racketeering violations, criminal enterprises, and criminal street gangs.

3. Based on my experience, training, and participation in numerous firearms investigations, I know that individuals commonly keep their firearms and ammunition on their person, in their residence and their vehicles, and that safes and locked storage containers are frequently used to secure firearms and ammunition. *See, e.g., United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (finding it reasonable for the magistrate to conclude a firearm was kept inside defendant's residence, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence"); *United States v. Washington*, 139 F. App'x 479, 482 (4th Cir. 2005) (concluding that "the handgun sought by the warrant was likely to remain" . . . in defendant's "car or house").

4. I know that cellular telephones are often used by individuals to facilitate the commission of criminal acts, including the unlawful procurement of firearms by prohibited persons via person to person sale. Further, I am aware that incriminating evidence is often located within text messages, as well as photos and videos contained on cellular telephones, including photos and videos uploaded onto social media platforms that may be evidence of criminal violations. Additionally, call logs (for incoming, outgoing, and missed calls), stored contact lists, and location information have proven to be valuable evidence in criminal cases. Moreover, I am familiar with technology, such as Cellebrite mobile data transfer equipment, that allows law enforcement investigators to

2

harvest data (such as incoming and outgoing text messages, photos, videos, call logs, and contacts) from cellular telephones. I also know that it is common for individuals involved in criminal activity to use cell phones subscribed in a name other than their own, and to use "pre-paid" cellular telephones for which no real subscriber information is available.

5. I also know that it is common for individuals to utilize cell phones to take photographs or videos and post them to social media platforms such as Facebook, Instagram, and Twitter. The original photographs and videos are often stored on the cell phones, and information about the date, time, location, and device utilized to take the photographs and videos may be stored on the cell phones. It is also common for individuals to utilize "live" features with Facebook and Instagram applications on cell phones that allow users to stream real time video from their cell phones that is viewable by other users.

6. I have been the affiant on search warrants and prepared affidavits for other affiants for numerous search warrants. As a case agent, I have experience in the fundamentals of mobile communications, electronic and cellular data analysis. I have also received training from ATF as a Digital Media Collection Specialist ("DMCS"), which includes but is not limited to the extraction and analysis of data from cellular telephones for the purpose of evidence collection in Federal firearms cases.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Accordingly, based on my training and experience and the totality of the evidence detailed below, probable cause exists to believe that the above-listed cellular telephones contain evidence of violations of 18 U.S.C. § 922(g)(4) – possession of a firearm and ammunition by a person who has

*DB*

been adjudicated as a mental defective or who has been committed to a mental institution. Further, probable cause exists to believe that stored on the property sought to be searched there is now concealed evidence of the commission of, the fruits of, or property which has been used as the means of committing those crimes, all of which is more particularly described in Attachment B hereto.

## PROBABLE CAUSE

### Background

9. I have been investigating Columbia resident Javares Montel WATKINS ("WATKINS") for possible violations of 18 U.S.C. § 922(g)(4). WATKINS is a validated member of the Bloods criminal street gang who has been found by the Circuit Court in Richland County to be not competent to stand trial due to an "intellectual disability" and deemed unlikely to become competent in the foreseeable future. WATKINS has also been judicially admitted by the Probate Court in Richland County to the jurisdiction of the South Carolina Department of Disabilities and Special Needs (SCDDSN) for court-ordered inpatient and outpatient treatment and services. I have reviewed WATKINS' criminal history and know that he has been involved in numerous firearms-related offenses in the Columbia area in the past, including but not limited to a 2015 Assault and Battery of a High and Aggravated Nature matter in which WATKINS shot another individual; a 2016 Armed Robbery incident in which WATKINS allegedly robbed an individual of a cell phone while armed with a handgun; a 2016 incident in which WATKINS was found to be in possession of a stolen pistol; a 2017 incident in which WATKINS allegedly pointed a firearm at multiple individuals and then fired multiple projectiles from the firearm into the air after making threatening statements to kill and harm the witnesses/victims; and a 2017 incident in which WATKINS and another suspect allegedly robbed an individual of $250.00 at gun point.

4

10. I have reviewed a July 17, 2018 court order titled "Finding of Lack of Competence to Stand Trial for the Foreseeable Future and Ordering Probate Commitment Proceedings" in the Richland County Court of General Sessions. WATKINS was before the court having been charged with armed robbery. Based on court ordered evaluations that had been completed, the court found that WATKINS was not currently competent to stand trial and was unlikely to become competent in the foreseeable future. It was ordered that the Solicitor responsible for the prosecution of WATKINS initiate judicial admission proceedings in the Richland County Probate Court. It was further ordered that pending the commencement of judicial admission proceedings, and until such time as the Probate Court gained jurisdiction over WATKINS by finding that WAKINS met the criteria for civil commitment, WATKINS should be admitted to an intellectual disability facility or otherwise remanded to services through SCDDSN if incompetent due to an intellectual disability or a related disability.

11. I have also reviewed a September 5, 2018 "Order for Judicial Admission" from the Richland County Probate Court that stated that WATKINS was found to be not competent to stand trial based on a diagnosis of an intellectual disability or a related disability, and was not likely to be restored to competency. WATKINS was judicially ordered to be admitted to the jurisdiction of SCDDSN.

12. For the purposes of the 18 U.S.C. § 922(g)(4) federal prohibition against the possession of a firearm or ammunition by a person "who has been adjudicated as a mental defective or who has been committed to a mental institution," 27 CFR § 478.11, Meaning of Terms, defines "adjudicated as a mental defective" as:

> *(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:*

*(1) Is a danger to himself or to others; or*

*(2) Lacks the mental capacity to contract or manage his own affairs.*

*(b) The term shall include -*

*(1) A finding of insanity by a court in a criminal case; and*

*(2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.*

13. The South Carolina Intellectual Disability, Related Disabilities, Head Injuries, and Spinal Cord Injuries Act, Section 44-20-30 provides further explanation of "intellectual disability" as the term has been used in state court actions involving WATKINS:

*(12) "Intellectual disability" means significantly sub average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.*

14. Following these findings of the Richland County Circuit Court and the Richland County Probate Court referenced above, triggering the 18 U.S.C. § 922(g)(4) prohibition, evidence indicates that WATKINS has been in possession of firearms and ammunition which has prompted an ATF investigation that has led the agency to believe WATKINS is in violation of 18 U.S.C. § 922(g)(4).

Alleged Criminal Conduct by WATKINS since his Outpatient Discharge on March 27, 2019

15. On March 27, 2019, WATKINS was discharged from his court-ordered inpatient treatment with Palmetto Behavioral Health - Summerville to the custody of his mother, Dorothy Tiwanda Watkins, at ███████████ Columbia, SC 29223. The Clinical Discharge Summary for WATKINS noted that he was to continue outpatient therapy services at Baptist Hospital. WATKINS' diagnosis was listed as Unspecified Intellectual Disability, Conduct Disorder, and Unspecified Mood Disorder.

16. On April 23, 2019, Lexington County Sheriff's Department (LCSD) deputies responded to a shoplifting at Palmetto State Armory (PSA) located at 3760 Fernandina Road, Columbia, SC

29210.  PSA Loss Presentation had detained WATKINS and had surveillance video of WATKINS with another black male later identified as Anthony Green.  The video showed Green pick up two extended Glock magazines and tuck them under his hoodie.  WATKINS was nearby but claimed to not see the action.  WATKINS and Green exited the store and began to walk to a dark grey Toyota Corolla that was later determined to have been stolen out of Forest Acres Police Department (FAPD) jurisdiction the previous day.  Green dropped one of the magazines and WATKINS picked it up.  As PSA Loss Prevention approached the two, they told them they observed them and that they needed to return the items.  WATKINS threw down the magazine and said something to the effect of "y'all can have that."  PSA employees told them that they were going to be put on "No Trespass," that they needed to give the items back, and sign papers promising they wouldn't return.  Green fled from PSA employees, eventually leaping through the outer perimeter fence.  WATKINS was detained by PSA employees until LCSD deputies arrived.  LCSD deputies, not yet knowing that the Toyota Corolla was stolen, had PSA employees un-detain WATKINS and placed him on Trespass Notice.  When Extreme Recovery responded to tow the Toyota Corolla, a rectangular box of .22LR caliber ammunition was located in the center console area.  The box of ammunition was eventually transferred to FAPD custody.

17. On May 2, 2019, members of the Midlands Gang Task Force (MGTF) and Columbia ATF office were made aware of an Instagram video being filmed by WATKINS through the "live" feature on his account with user name "jaythreekappinn."  Based on knowledge from previous investigations, it was determined that the video was being filmed at WATKINS' residence located at ██████ ████████ Columbia, SC 29223.  Investigators had knowledge that WATKINS had active arrest warrants from LCSD jurisdiction as a result of the shoplifting incident that occurred on April 23, 2019 at PSA.  I responded to the area of ███████████ along with Investigator Travis

Rodgers (Columbia Police Department (CPD) assigned to MGTF), Inv. Ryan McIntyre (CPD - MGTF), and ATF Task Force Officer (TFO) Cat Robison. While in route to the location, we were informed by a CPD crime analyst who was monitoring WATKINS' Instagram account that WATKINS was observed to be in possession of a pistol and smoking what appeared to be a marijuana cigar in the live video. WATKINS was wearing a light colored tank top and a red Nike headband in the video. A young child, believed to be WATKINS' younger brother who is approximately 3 years old, was observed nearby WATKINS in the live video. Below is a screen shot from the live video referenced.



18. We arrived in the neighborhood at approximately 12:46 p.m., at which time I observed WATKINS
sitting in a chair on his front porch. WATKINS was wearing the same clothing observed from the
Instagram live video. We began conducting surveillance at the location while Inv. Rodgers
coordinated the assistance of RCSD marked units to conduct a traffic stop on WATKINS if he left
the residence. Inv. Rodgers took a perimeter surveillance position at the 8900 block of Two Notch
Road in the BB&T parking lot.

19. At approximately 4:32 p.m., Inv. Rodgers observed WATKINS walking through the parking lot towards him from the direction of the railroad tracks, which is located behind WATKINS' residence on ███████████ Inv. Rodgers exited his unmarked vehicle and told WATKINS to come towards him. Inv. Rodgers was dressed in a police uniform with an outer tactical vest marked with "Police" on the front. WATKINS stated, "No, last time you put me in jail." WATKINS then began to flee from Inv. Rodgers on the sidewalk, north bound on Two Notch Road. WATKINS then ran back across the railroad tracks towards ███████████ WATKINS was wearing blue jeans, a white tee shirt, a red headband, and had a red bag on his person at the time of contact. As WATKINS crossed the railroad tracks, he entered the back yard of ███████████ Inv. Rodgers observed WATKINS pacing in the back yard at which time in appeared as if he was checking the back door of the residence at the location to see if it was unlocked. Inv. Rodgers then observed WATKINS throw an object back in the direction of the railroad tracks, which was later determined to be TT-3. A second cell phone was later located in the same area, which was determined to be TT-2. Both phones were collected as items of evidence as they were in the area that Inv. Rodgers saw WATKINS throw an object, both phones appeared to be in good condition and on top of surrounding brush, and both were outside of the fenced backyard of ███████████ ███ I know from speaking with MGTF investigators on prior law enforcement actions involving WATKINS that WATKINS is known to have multiple phones on his person at one time, as he was on May 2, 2019, and it is believed that this may be related to the theft and re-sale of cell phones. WATKINS has previously been found to be in possession of property stolen from vehicle break-ins. Based on WATKINS' history, his conduct on May 2, 2019, and the factors above, it is believed that WATKINS disposed of both TT-2 and TT-3 during his flight on foot on May 2, 2019.

20. Inv. Rodgers notified other units, to include K-9 deputies, who responded to the location. RCSD K-9 Sgt. Abraham began conducting a K-9 track of WATKINS. The K-9 track led officers to ▊▊▊▊▊▊▊▊▊▊▊ where it was confirmed that WATKINS was inside the residence. Three individuals exited the residence, all of whom confirmed WATKINS was inside. Incident command was established and officers began conducting "call outs" for WATKINS to exit the residence. After approximately 50 minutes, WATKINS' mother was able to make contact with WATKINS via phone and convince him to exit the residence. WATKINS exited the residence through the garage, where he was safely apprehended by RCSD deputies.

21. Once WATKINS was in custody, he was placed in Inv. Rodgers' unmarked patrol vehicle. RCSD Inv. Carey Roberts and TFO Robison stood by with WATKINS. TFO Robison offered WATKINS water. WATKINS accepted and then asked where his phone was. TFO Robison inquired where it might be and he stated possibly inside the residence where he was taken into custody. WATKINS then changed his position to asserting his mother most likely had possession of it. TFO Robison inquired as to what the phone looked like. WATKINS stated it was an iPhone 8 that was light grey. WATKINS stated that the lock screen phone was of him and his infant child. TFO Robison recognized WATKINS' mother, Dorothy Tiwanda Watkins, who was approaching on foot. TFO Robison intercepted her and advised that she could not speak with WATKINS yet. TFO Robison inquired if she had WATKINS' cell phone, to which she replied no, but that she had spoken to him on someone else's phone and advised him to turn himself in.

22. Inv. Rodgers then made contact with Sandarrell Squire, who was the homeowner of ▊▊▊ ▊▊▊▊▊▊▊▊▊ the home from which WATKINS emerged. Ms. Squire provided written and verbal consent to search her residence. The search of the residence at ▊▊▊▊▊▊▊▊▊▊▊ was conducted by myself, Inv. Rodgers, RCSD Inv. M. Brown, and TFO Robison. A red bag consistent

11

*PB*

with the bag that WATKINS was wearing was located on a shelf of an upstairs bedroom closet. TT-1 was located less than one foot away on the same shelf. TT-1 had a picture of WATKINS and known associate Anthony Green (see paragraph 16) saved as a background on the lock screen. Green was not present in the residence on that date. Officers also located and collected a red Nike headband in the floor of the same bedroom. The headband was consistent with the one that WATKINS was previously wearing when he fled on foot. Ms. Squire further stated that she observed WATKINS enter her residence with the red bag and headband that officers located. Ms. Squire did not have knowledge of TT-1 that was located, and determined that none of the items collected, including TT-1, belonged to her. Ms. Squire consented to officers seizing the items as evidence. Prior to leaving Ms. Squire's residence, she made a statement to Inv. Rodgers and I that she overheard "the kids" talking, who stated that there was a rifle in the trunk of a car in the front yard of WATKINS' residence at ████████████████████.

23. TFO Robison spoke to WATKINS' mother who provided written and verbal consent to search her residence and vehicles on her property at ████████████████    TFO Robison, Officer Anna Cantrell (University of South Carolina Police Department (USCPD) assigned to MGTF), S/A Chris Baker (ATF), S/A Richard Brown (ATF), and S/A OC Evans (ATF) responded to the residence to begin the search with WATKINS' mother present. Inv. Rodgers and I walked and canvassed the route that WATKINS ran during the foot pursuit to ensure that no evidence was left behind, and then we relocated to ████████████████ to assist with the search.

24. Ms. Watkins advised TFO Robison that she had a box of .380 caliber ammunition under her mattress in her bedroom. Ms. Watkins stated that the rooms were still occupied by the same people from a year ago when another search warrant was executed by MGTF, which is further described below in paragraph 33. Ms. Watkins advised that her bedroom was located next to the kitchen,

Javares WATKINS stayed in the first bedroom on the left from the hallway, her daughter was the last room on the right of the hallway, and her infant child's room was located next to Javares WATKINS' on the left. Ms. Watkins also advised that Javares WATKINS was supposed to stay with his grandmother in Winnsboro, but could not provide an address. TFO Robison asked Ms. Watkins if Javares WATKINS was still on probation to which she stated she thought he was on some type of probation but did not know a probation officer's name nor which address Javares WATKINS provided as his current residence.

25. A search of a silver Hyundai bearing a paper tag of 3047136 was conducted by S/A Baker, S/A Brown, and recorded by Officer Cantrell. S/A Baker, S/A Brown and Officer Cantrell were unable to gain access to a black Dodge Charger with no tag also parked on the property. Ms. Watkins stated she did not possess the keys to either vehicle and did not know where or who had them. Ms. Watkins stated both vehicles were registered in her name. The Dodge Charger was also on the property a year prior during the same search warrant execution by MGTF. Ms. Watkins gave permission to force entry into the vehicle. Contact was made with Inv. Rodgers to respond with a "lock out" kit to prevent damage upon entry into the vehicle.

26. S/A Berlin, Inv. Rodgers, Officer Will Brackett (CPD assigned to MGTF) and RCSD Inv. Roberts arrived at ████████████████ Inv. Rodgers was successful in gaining entry into the Dodge Charger using the "lock out" kit. We located a Tippmann Arms M4-22 .22LR caliber rifle (S/N: 000661) in the trunk of the vehicle. The rifle was in a black in color rifle case and contained a magazine with one round of .22LR ammunition inserted into the magazine. The rifle was seized as evidence. The rifle was not manufactured in the State of South Carolina and thus traveled in or affected interstate commerce. A trace of the rifle determined that it had been purchased from

Shooters Choice in Wilmington, NC by Ryan Steven Sersland on August 13, 2018.    The investigation into how the rifle went from Sersland's possession to WATKINS is ongoing.

27. The ammunition recovered from the stolen Toyota Corolla that WATKINS was detained near at PSA on April 23, 2019 was the same caliber as the rifle recovered on May 2, 2019 from the driveway of WATKINS' residence.

28. The rifle had a distinctive scope, sling, and shoulder stock attached to it that was consistent with a rifle in a post made from WATKINS' Instagram account that appeared to show him holding the same rifle.  The post was estimated to have been made on or about April 25, 2019, approximately one week before the rifle was recovered. I am aware that WATKINS appears to use cellular telephones to document and upload evidence of his firearm possessions on a range of social media platforms including Facebook and Instagram beginning at least in the spring of 2018 and continuing through April 25, 2019. Below is a screenshot of the Instagram post next to a photograph of the recovered rifle:




14

DCB

29. After the rifle was recovered, Ms. Watkins stated that Javares WATKINS had been hanging out with "Ant/Amp" also known as Anthony Green. Ms. Watkins claimed she had observed Green with a rifle and notified law enforcement.

30. I conducted a brief interview with Ms. Watkins in the company of Inv. Rodgers.  During the interview, I inquired about the firearm located in the trunk of the Dodge Charger in the driveway. Ms. Watkins stated that her son, Javares WATKINS, hangs out with two other guys that she knows by "D Rose" and "Sway." Ms. Watkins stated that someone stole the keys to her vehicle and that she believed that "Sway" was likely the person who left the firearm in her vehicle. Ms. Watkins referred to "D Rose" as "Ant" in conversation as well.  Inv. Rodgers knew from previous interviews and investigations that Anthony Green goes by both nicknames "D Rose" and "Ant / Amp." Ms. Watkins did not know the real name of "Sway," but described him as a small, brown skin, male with a short haircut. Ms. Watkins did admit to knowledge of the rifle and stated that she had previously observed the firearm on her property while some of Javares WATKINS' associates were at the location.

31. At the conclusion of the search, S/A Brown documented a list of items seized from the residence. TFO Robison went over the list of seized items with Ms. Watkins. Ms. Watkins acknowledged that ammunition, cell phones, and thumb drives found in the grey Hyundai in the driveway possibly belonged to her boyfriend, "Reggie," and that those items have been there for approximately one year. Ms. Watkins could not account for one round of CBC 9mm ammunition located in Javares WATKINS' bedroom or 13 rounds of CBC 9mm ammunition in a Magtech ammunition box located in her younger son's (approximate age 3 years old) bedroom. Ms. Watkins advised that seven rounds of .380 ammunition found underneath the dryer belonged to her and were from the

DCG

same box of .380 ammunition located under her mattress. Ms. Watkins stated she put the
ammunition under the dryer to keep them away from Javares WATKINS.

32. All items collected from both residences were photographed and secured into evidence at RCSD.

### May 16, 2018 Search Warrant at WATKINS' Residence after Social Media Posts

33. I am aware that under similar circumstances, a Glock pistol with a mounted light and clear
extended magazine was recovered in the younger son's room of the WATKINS residence during
a search warrant executed by the MGTF on May 16, 2018. A similar or the same Glock pistol
with a mounted light and clear extended magazine was displayed by WATKINS in social media
posts prior to the execution of that search warrant at a time WATKINS was operating with the
username "GlockBoy Jay Kappin." The following images are screen shots of those social media
posts following by a photograph of the recovered Glock pistol:





34. The Glock pistol in that case was determined to have been stolen and was linked through the National Integrated Ballistic Information Network (NIBIN) to three separate shooting incidents that occurred on March 31, 2018, April 11, 2018, and April 17, 2018 all in the Columbia, S.C. area before it was recovered at WATKINS' residence on May 16, 2018.

<u>Other Social Media Posts made by WATKINS in 2019</u>

35. Additional posts have been made to social media by WATKINS since his outpatient discharge on March 27, 2019. The following post was made to WATKINS' Instagram account on or about April 30, 2019 and appears to show two pistols for sale:

17



36. The following post was made to WATKINS' Instagram account on or about May 1, 2019 and appears to show WATKINS with a pistol:



18

Subsequent Probate Court Proceedings

37. On May 6, 2019, WATKINS was released on bond from the Lexington County Detention Center.

38. On May 7, 2019, a Richland County Probate Court Order was issued to have WATKINS picked up by law enforcement and that he be detained at Alvin S. Glenn Detention Center until a hearing could be held regarding the appropriate placement and services provided by SCDDSN. I assisted RCSD deputies and members of the MGTF with taking WATKINS into custody on the same date.

39. On May 9, 2019, I attended a Richland County Probate Court hearing for WATKINS in front of Probate Judge Jacqueline D. Belton. I subsequently obtained and reviewed an "Order Regarding Status Hearing" issued by Judge Belton on the same date which stated the following:

    a. *"This matter came before the court upon notification from the 5th Circuit Solicitor's Office that Javares WATKINS had been charged with new criminal charges that involved firearms. A Petition for Judicial Admission had previously been filed by the Solicitor's Office on July 20, 2018 after Mr. WATKINS was found not competent to stand trial in previous criminal proceedings in circuit court. At the last hearing held on August 21, 2018 Javares WATKINS was ordered to be admitted to the jurisdiction of the South Carolina Department of Disability and Special Needs (DDSN). The plan for services at that hearing was that Javares would be release from jail once a bed was available to the Palmetto Summerville Facility and if Javares was stepped down to a less restrictive setting that DDSN was required to notify the Solicitor's Office.*

    b. *"Present at today's proceedings were John Steadman, Assistant Solicitor; Ben Stitely, Criminal Defense Attorney; Marvin L. Bartlett, Court Appointed Attorney and Guardian ad Litem for the purposes of the Probate Court proceedings; Steve*

*Von Hollen, Director of Clinical Services for DDSN; David Rogers, Investigator; Dorothy Watkins, mother of Javares; and various other law enforcement officers, and an administrative supervisor and case managers from DDSN.*

c.   *"At the hearing the court received testimony that Javares WATKINS was released from placement at Palmetto Summerville facility on March 27, 2019 to live with his mother Dorothy Watkins. The Solicitor's Office and Investigator was able to provide pictures and video of Javares WATKINS with firearms. The current charges for Javares WATKINS were for shoplifting in Lexington County from a break in at the Palmetto State Armory. DDSN provided information that Javares did well while he was at Summerville Palmetto Facility and his mother participated in family counseling. The plan when he was released was for him to return home and participate in case management through the DSN Board. DDSN agreed given the severity of the information presented today that home is not the appropriate placement at this time and that additional treatment is needed through an inpatient setting such as Wellpath Facility. The Guardian ad Litem also agreed that release to home today would not be I the best interest of Javares WATKINS.*

d.   *"Based on the testimony and information presented to the court, I find that given the issues that Javares WATKINS be detained at Alvin S. Glenn Detention Center until he can be transferred to Wellpath or another inpatient jail facility that is appropriate. DDSN will assist in facilitating the transfer. Javares WATKINS must have another forensic evaluation and risk assessment done and presented to the court. The Solicitor's Office will assist in facilitating the assessments. A hearing*

*will be held once this court receives the assessments. Javares WATKINS cannot be released from jail custody until a hearing is held by his court.*

e.  *"It is also ordered that Javares WATKINS who has previously been found to be intellectually disabled, pursuant to S.C. Code Ann. §§ 23-31-1040(A) and 23-31-1020, is prohibited from having access to, purchasing, and possessing firearms and ammunition and Javares WATKINS name will be reported to SLED for this purpose."*

## CONCLUSION

For the reasons set forth above, I respectfully submit there is probable cause to believe that there is evidence on the above-listed cellular telephones of violations of 18 U.S.C. § 922(g)(4) – possession of a firearm and ammunition by a person who has been adjudicated as a mental defective or who has been committed to a mental institution. I further submit there is probable cause to believe that evidence of these crimes, as more particularly described in Attachment B, will be found on each of the cellular telephones set forth in Attachment A hereto. Accordingly, I respectfully request that the Court issue search warrants for these cellular telephones.

This affidavit has been reviewed by Assistant United States Attorney Elliott B. Daniels.

I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

*< signature blocks to follow >*

21

Donald Berlin, Special Agent, ATF

Subscribed and sworn to before me on May 20, 2019

Paige Jones Gossett
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

- A silver and black Apple iPhone Model A1688 cellular telephone, referred to as Target Telephone 1 (TT-1), along with its contained SIM card and any removable media.

- A Samsung Model SM-G890A cellular telephone bearing IMEI: 352131071028367, referred to as TT-2, along with its contained SIM card and any removable media.

- A Samsung Model SM-N920V cellular telephone bearing IMEI: 990005890512016, referred to as TT-3, along with its contained SIM card and any removable media.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED

The following evidence of the commission of, the fruits of, or property which has been used as the means of committing, federal criminal violations of 18 U.S.C. § 922(g)(4) will be searched for and seized on the cellular telephones described in Attachment A[1], including their contained SIM cards, and any removable media therein:

1. Subscriber information or contact information, including, but not limited to, names, addresses, telephone numbers, e-mail addresses, or other identifiers;
2. Call log information, including, but not limited to missed, incoming and outgoing calls, and any information associated with those numbers;
3. Address books;
4. Calendar, note, or password entries;
5. Photographs, including any geolocation tags and date and time stamps associated with such photographs, video, and audio files;
6. Internet or browser entries or history;
7. Information, including search history, saved locations, and prior destinations from any mapping or GPS application or device;
8. System, data, or configuration information contained within the Target Telephone;
9. Voicemail messages, text messages, chats, multimedia messages, installed applications, or other electronic communications;
10. Evidence of the times the Target Telephone was used;
11. Passwords, encryption keys, and other access devices that may be necessary to access the Target Telephone;
12. Documentation and manuals that may be necessary to access the Target Telephone or to conduct a forensic examination of the Target Telephone.
13. Records of or information about Internet Protocol addresses used by the Target Telephone;
14. Records of or information about the Target Telephone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;
15. All records, documents or correspondence, in any form, reflecting personal contact or any other activities with individuals, relevant to the Specified Federal Offense;
16. All images of the user and files containing images of the user;
17. All films, videos, and other recordings, in any form, of visual depictions of the user.

---

[1] Agents are only seeking authority to search for items stored/recorded on the cellular telephones described in Attachment A. Agents are not seeking, nor do they intend to use the Devices to remotely access any other electronic database(s).